2014 CO 37

**TOWN OF DILLON, Colorado, Petitioner**

v.

**YACHT CLUB CONDOMINIUMS HOME OWNERS ASSOCIATION, Steve Delaney, and Robert R. Duncan, Respondents.**

**Supreme Court Case No. 12SC104**

Supreme Court of Colorado.

May 27, 2014

Attorneys for Petitioner: Nathan, Bremer, Dumm & Myers, P.C., J. Andrew Nathan, Ellis J. Mayer, Denver, CO.

Attorneys for Respondents: Davis Graham & Stubbs LLP, Richard P. Holme, Andrew M. Low, Denver, CO, Gassman Law Firm, LLC, Edward C. Gassman, Loveland, CO.

Attorneys for Amicus Curiae Colorado Apartment Association: Tschetter, Hamrick, Sulzer, PC, Andrew C. Hamrick, Mark N. Tschetter, Victor L. Sulzer, Denver, Colorado.

Attorney for Amicus Curiae Colorado Municipal League: Colorado Municipal League, Rachel L. Allen, Denver, Colorado.

JUSTICE MÁRQUEZ delivered the Opinion of the Court.

¶ 1 In 2009, the Town of Dillon ("Town") enacted two municipal ordinances, one authorizing a local road improvement project, and the other concerning parking enforcement on the public right-of-way. Owners of the Yacht Club Condominiums ("YCC") challenged the ordinances. They alleged, among other things, that the ordinances were an unreasonable exercise of the Town's police power because they eliminated the ability of YCC owners and guests to use the Town's rights-of-way near the YCC for overflow parking.

¶ 2 The trial court entered judgment against the Town, ruling, among other things, that the Town abused its police power in enacting the ordinances and deprived the YCC owners of substantive due process. In determining that the Town's exercise of its police power was unreasonable, the trial court considered and weighed the burden of the ordinances on the YCC, as well as the cost and availability of less burdensome alternatives to the adopted measures. The trial court ordered the Town not to prohibit the YCC's owners, renters, guests, or occupants from parking on the Town's rights-of-way adjacent to and across from the YCC. The court of appeals affirmed the trial court in an unpublished decision, essentially adopting the reasoning of the trial court. *Yacht Club Condos. Home Owners Ass'n v. Town of Dillon*, No. 10CA2681, 2011 WL 11745389 (Colo.App., Dec. 29, 2011) (not published pursuant to C.A.R. 35(f)).

¶ 3 We granted certiorari review.[1] We hold that, in enacting the two ordinances at issue here, the Town did not abuse its police power or deprive the YCC owners of due process. An ordinance comports with due process where it bears a reasonable relationship to a legitimate government interest. The ordinances here were within the Town's police power to regulate matters of public health, safety, and welfare. The measures

---

1. We granted certiorari review on the following issue:

    Whether the Town of Dillon's enactment of Ordinance Nos. 04–09 and 10–09 was an un-

constitutional exercise of the Town's police power to regulate matters of public health, safety, and welfare.

were a reasonable exercise of that power because they were reasonably related to the Town's objectives of improving traffic safety, improving water drainage, and remedying a missing portion of a recreational bike path. Accordingly, we reverse the court of appeals and remand this case to the court of appeals to review the Town's challenges to the trial court's other bases for relief.

## I.

¶ 4 Plaintiffs are owners of the YCC, located in the Town of Dillon, Colorado, a home rule municipality. The YCC is located at the intersection of Gold Run Circle and Tenderfoot Street. The Town owns rights-of-way alongside both sides of Gold Run Circle and Tenderfoot Street.

¶ 5 The YCC consists of three buildings with fifty condominium units. The three-bedroom units have "lock-offs"—a bedroom with a separate kitchen and lockable entry—such that the YCC has as many as sixty-six separate dwelling units. When the YCC was constructed between 1965 and 1967, the Town considered requiring the developer to provide off-street parking. The developer successfully opposed such a requirement, relying on this court's decision in *City & County of Denver v. Denver Buick, Inc.*, 141 Colo. 121, 347 P.2d 919 (1959) (holding that a zoning ordinance requiring landowners to provide off-street parking was per se unconstitutional as a taking of property without just compensation).[2]

¶ 6 The YCC has designated a common area for on-site parking along the front of its property that is large enough to allow up to forty-three cars to park perpendicular to the buildings. For many years, when the on-site parking spaces were full, YCC owners and guests "tandem parked"—that is, one car parked perpendicular to the building on YCC property, and a second car double-parked immediately behind it on the Town's right-of-way. YCC owners and guests also parked their cars on the Town's right-of-way across the street from the YCC. Although the record reflects that the Town sent letters to the YCC complaining about the parking situation and asking the YCC to propose a permanent solution to the problem, there is no evidence that, prior to 2009, the Town passed any ordinance or enforced any law outlawing tandem parking or parking in its rights-of-way.

¶ 7 In 2009, the Town enacted two ordinances that effectively eliminated the ability of YCC owners and guests to use the Town's rights-of-way near the YCC for overflow parking. First, Ordinance No. 04-09 authorized the Town to enter into a construction contract as part of a larger road improvement project. In the part of the project relevant here, the Town made improvements to portions of Tenderfoot Street and Gold Run Circle and constructed a recreational bike path along Gold Run Circle across the street from the YCC. The ordinance states that the Town undertook the project to: (1) address "current road conditions ... resulting in unsafe driving conditions which threaten lives and property"; (2) "improve ... drainage"; and (3) "remedy a now-missing portion of the recreation path," which, as configured at that time, "forces current users of the recreation path ... into a street where they mix with traffic rather than allowing them to remain on the recreation path where they avoid traffic."

¶ 8 Second, Ordinance No. 10-09 amended the Dillon Municipal Code definition of "street" to include "the entire width of every dedicated public right-of-way owned or controlled by the Town." The stated purpose of Ordinance 10-09 was to "ratify and affirm the previously granted and current authority of the Town of Dillon Chief of Police to determine and designate those streets and rights of way within the Town where parking shall be prohibited." Accordingly, the ordinance authorized the Chief of Police to designate no-parking zones within any of the Town's rights-of-way. After Ordinance 10-

---

**2.** Several years after the YCC was built, this court overruled *Denver Buick* in *Stroud v. City of Aspen*, 188 Colo. 1, 6, 532 P.2d 720, 722–23 (1975) (holding that off-street parking requirements are not per se unconstitutional as a taking of property without just compensation; such requirements should receive the same consideration as zoning ordinances, which are "constitutionally permissible so long as [they are] not arbitrary and [are] reasonably related to the public safety, morals and welfare").

09 was enacted, the Chief of Police posted "No Parking" signs across the street from the YCC on both Gold Run Circle and Tenderfoot Street, and painted "No Tandem Parking" on the Town's right-of-way adjacent to the YCC. The Chief did not post similar signs anywhere else in Dillon.

¶ 9 The Plaintiffs filed suit, seeking a declaratory judgment that: (1) the Town was barred by the doctrine of equitable estoppel from eliminating the ability of YCC owners and guests to park on the Town's rights-of-way; and (2) the actions of the Town in eliminating such parking amounted to an abuse of police power.

¶ 10 At a bench trial on their claims, the Plaintiffs presented evidence to show that the ordinances negatively impacted the value of their condominiums because it reduced the available parking in the area. They also produced evidence to show that the project could have been built in ways less burdensome to the YCC—for example, by configuring the roadway and recreation path to permit YCC owners and guests to continue to park on the Town's rights-of-way. In response, the Town presented evidence that the ordinances were related to improving traffic safety, improving drainage from storm water and snow runoff, and remedying a missing portion of the recreation path. Witnesses for the Town also testified about concerns with the alternatives identified by the Plaintiffs.

¶ 11 The record reflects that it was undisputed that the road improvement project satisfied the Town's need to construct a missing portion of a recreation path that pedestrians and bicyclists used to travel to the town center. The adjoining recreation path separated pedestrians and bicyclists from cars, eliminating the need to share the same traffic lane. It was also undisputed that the project placed drainage pans along both Gold Run Circle and Tenderfoot Street to collect and move storm water and snow runoff into Lake Dillon.

¶ 12 In addition, the Town presented evidence of its safety concerns with regard to tandem parking and backing out into traffic from a right-of-way. The Town Engineer, the Town's Chief of Police, the Town's Public Works Director, a Town resident, and a transportation engineer, retained as an expert by the Town, all testified that the tandem parking configuration was a public safety concern.

¶ 13 The Town Engineer testified that tandem parking created a potentially dangerous situation because it forced drivers to reverse their cars from their parking spaces, while at the same time turning ninety degrees to merge into oncoming traffic. Because the tandem-parked car directly abutted the street, this maneuver required the driver to back across both lanes of traffic. Often, drivers were unable to see oncoming traffic until they were partially in the street because their view was obstructed by cars parked beside them.

¶ 14 In a deposition transcript introduced at trial, the Chief of Police testified that the only accident on record caused by tandem parking near the YCC involved a snowplow and a parked car. The Chief testified, however, that this fact did not mean that tandem parking was safe, stating, "You don't have to have accidents before you take action."

¶ 15 The Public Works Director testified that on some occasions, tandem-parked cars protruded into the roadway—obstructing the roadway for the traveling public and for snowplow operators.

¶ 16 A Town resident testified that he was concerned that drivers of tandem-parked cars had limited visibility when they backed into traffic from the right-of-way. Additionally, he observed that the tandem-parking configuration had the effect of making the roadway narrower, forcing vehicles to "have to share basically one lane." He stated that the tandem-parking configuration and the lack of a recreation path to separate pedestrians from traffic was "an accident waiting to happen."

¶ 17 The transportation engineer testified that in his thirty-five years of experience in public jurisdictions, he had never encountered a tandem-parking situation like that at the YCC. He testified that tandem-parked cars protruding into the roadway create safety concerns, that cars backing out of their tandem-parked spaces have limited visibility,

and that it is not a good practice to have a parked vehicle in a public right-of-way blocking another vehicle.

¶ 18 During closing argument, Plaintiffs challenged the legitimacy of the Town's safety concerns, pointing out that there was evidence of only one accident resulting from the tandem-parking configuration.

¶ 19 The trial court entered judgment in favor of the Plaintiffs on its police power and equitable estoppel claims, and additionally held that the ordinance prohibiting parking in the Town's rights-of-way was unconstitutionally retrospective.

¶ 20 Relevant here, the court found that the road improvement project sought to:

[I]mprove the quality of Gold Run Circle and Tenderfoot Streets; aid drainage of storm waters and snow melt; complete a missing link in a recreation path extending from Frisco to Keystone, and thereby create significant economic and recreational benefits to large numbers of people; and enhance the safety of both bicyclists and persons walking, hiking, or running on the Rec Path by reducing the possibility of future accidents between those users [of the recreation path] and automobiles.

Nonetheless, the trial court ruled that the Town abused its police power and deprived the Plaintiffs of substantive due process. In arriving at this conclusion, the court relied on a passage in *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 595, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), which stated that, to evaluate the reasonableness of an ordinance, "we need to know such things as the nature of the menace against which it will protect, the availability and effectiveness of less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance." Without citation to authority, the trial court reasoned that, in addition to these factors, it should also evaluate "the cost to the Town or its citizens of any alternative means of accomplishing its desired objectives," and "the loss or reduction of any health, safety and welfare gains sought by the Town from its actions." After examining all of these factors, the trial court ultimately concluded that the Town acted arbitrarily because the Plaintiffs had proposed less burdensome alternatives that would accomplish the Town's goals of remedying the missing portion of the recreation path while alleviating safety, drainage, and snow storage concerns:

[T]he imposition of a potentially huge financial burden on the Plaintiffs and owners of the YCC is arbitrary and oppressive considering the reasonable alternatives, which would provide all the claimed benefits for residents of and visitors to the Town, with little or no detriment to the Plaintiffs or others in the Town.

The trial court held that the YCC had proven beyond a reasonable doubt that the portion of the road improvement project, as authorized by the ordinances and applied to the YCC, "constitutes an abuse of discretion and a violation of the Town's police power," and that "[a]s such, it violates Plaintiffs' right to substantive due process" under the federal and state constitutions.

¶ 21 On appeal, the Town challenged all of the trial court's rulings. In an unpublished opinion, the court of appeals affirmed, concluding that the ordinances were an unconstitutional abuse of the Town's police power. *Yacht Club Condos.,* slip. op. at 3. Like the trial court, the court of appeals relied on *Goldblatt* as the framework for analyzing whether an exercise of police power is reasonable:

The Supreme Court's decision in *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 595, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), sets forth three factors that a court should consider in evaluating whether an exercise of the police power is reasonable: (1) the nature of the menace; (2) the availability and effectiveness of alternative measures; and (3) the loss that the challenging party would suffer if the ordinance is enforced.

*Yacht Club Condos.,* slip. op. at 6. The court of appeals also considered the two additional factors added by the trial court, namely, the cost to the Town to pursue alternative measures, and whether the alternatives would reduce the health, safety, and welfare benefit to the Town. *Id.* at 9–10. The court of appeals concluded that the ordinances, analyzed with respect to the Plaintiffs, "were not

reasonably related to a legitimate government interest because they caused plaintiffs significant economic harm and there were alternatives available which would have furthered defendant's interests." *Id.* at 3–4. Because the court of appeals affirmed on the grounds that the ordinances were an abuse of police power, it did not address the Town's challenges to the trial court's other bases for relief, namely, that the ordinances violate the doctrine of equitable estoppel and Colorado's constitutional prohibition against retrospective legislation. *Id.* at 1. We granted the Town's petition for a writ of certiorari to review the court of appeals' decision.

## II.

¶ 22 In reviewing a trial court's judgment on the constitutionality of a municipal ordinance, we defer to the court's findings of fact unless they are clearly erroneous. *See Trinidad Sch. Dist. No. 1 v. Lopez,* 963 P.2d 1095, 1103 (Colo.1998) (reviewing factual findings in a constitutional challenge to a drug testing policy for clear error). However, we review the trial court's conclusions about the constitutionality of the ordinance de novo, including its analysis concerning the reasonableness of the ordinance. *Id.*; *see also E–470 Pub. Highway Auth. v. Revenig,* 91 P.3d 1038, 1041 (Colo.2004) (reviewing the constitutionality of a state statute de novo); *People v. Zinn,* 843 P.2d 1351, 1354 (Colo. 1993) ("Whether challenged legislation bears a reasonable relationship to a legitimate government interest is a question of law."). Generally, municipal ordinances are presumed to be constitutional, and the party challenging an ordinance bears the burden to prove its unconstitutionality beyond a reasonable doubt. *People ex rel. City of Arvada v. Nissen,* 650 P.2d 547, 550 (Colo.1982); *City of Leadville v. Rood,* 198 Colo. 328, 329, 600 P.2d 62, 63 (1979); *Love v. Bell,* 171 Colo. 27, 31, 465 P.2d 118, 121 (1970).

## III.

¶ 23 At issue in this case is whether the Town may constitutionally exercise its police powers to undertake a road improvement project that eliminates parking on the Town's rights-of-way near the YCC. The Plaintiffs' complaint alleges that the Town's ordinances are an unlawful and unreasonable exercise of the Town's police power because the ordinances "unreasonably restrict Plaintiffs from using their properties as dwelling units and decrease the value of their units." Importantly, the Plaintiffs have never contended that the Town's actions amounted to an unconstitutional taking under either the United States or the Colorado constitutions. Nor could they sustain such a claim because they have no property interest in the affected rights-of-way they were using for parking.

¶ 24 We first determine that an abuse of police power claim turns on the reasonableness of the relationship between the ordinance and the government objectives to be achieved—not the burden on the complaining party or the availability of less burdensome alternatives. We then apply this test to the ordinances at issue here and conclude that they were a reasonable exercise of police power because they were reasonably related to the Town's objectives of improving traffic safety, improving water drainage, and remedying a missing portion of a recreational bike path. Finally, we conclude that the passage that the trial court and court of appeals relied on from *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962), is unhelpful in resolving this case in light of the United States Supreme Court's more recent jurisprudence.

## A.

¶ 25 Police power "is an inherent attribute of sovereignty with which the state is endowed for the protection and general welfare of its citizens." *In re Interrogatories of the Governor on Chapter 118, Sess. Laws 1935,* 97 Colo. 587, 595, 52 P.2d 663, 667 (1935). Like the state, municipalities have broad police powers, including the power to establish laws that promote the health, safety, and welfare of citizens. *U.S. Disposal Sys. v. City of Northglenn,* 193 Colo. 277, 280, 567 P.2d 365, 367 (1977); *see also City of Colorado Springs v. Grueskin,* 161 Colo. 281, 288, 422 P.2d 384, 387 (1966) ("The City has inherent power to establish reasonable regulations which tend to promote the public

health, welfare and safety.").[3] Section 31–15–103, C.R.S. (2013), gives municipalities[4] "power to make and publish ordinances ... which are necessary and proper to provide for the safety, preserve the health, promote prosperity, and improve the morals, order, comfort, and convenience of such municipality and the inhabitants thereof not inconsistent with the laws of this state." Municipalities also have the express power to improve and regulate the use of streets, to build and repair sewers and drains, and to regulate traffic within municipal boundaries. *See* § 31–15–702(1)(a)(I), C.R.S. (2013) (governing body of each municipality has the power to "lay out, ... alter, widen, ... grade, ... or otherwise improve streets; to regulate the use of the same; [and] to prevent and remove encroachments or obstructions upon the same"); § 31–15–702(1)(a)(II) (power to build and repair sewers, tunnels, and drains); § 31–15–702(1)(a)(VII) (power to "regulate traffic").

¶ 26 Though broad, a municipality's police powers are limited by due process. "Due process ... requires only that a municipal ordinance enacted under the police power shall not be unreasonable, arbitrary or capricious, and that it bear a rational relation to a proper legislative object sought to be attained." *U.S. Disposal Sys.*, 193 Colo. at 281, 567 P.2d at 367.

¶ 27 In the police power context, we have consistently evaluated the reasonableness of an ordinance by examining the relationship between the provisions of the ordinance and the government interest or objective to be achieved. Although we have used various phrases to describe this relationship,[5] they essentially equate to rational basis review. Where, as here, an ordinance does not implicate a fundamental right,[6] the due·process clause requires only that the ordinance bear a rational relationship to a legitimate government interest. *Sellon v. City of Manitou Springs*, 745 P.2d 229, 232–33 & n. 6 (Colo.1987); *Colo. Soc. of Cmty. & Institutional Psychologists, Inc. v. Lamm*, 741 P.2d 707, 711 (Colo.1987). An ordinance promulgated for the health, safety, and welfare of the public is "reasonable" when it "fairly relates" to those objectives. *U.S. West Commc'ns, Inc. v. City of Longmont*, 948 P.2d 509, 521 (Colo.1997). In short, we evaluate the "reasonableness" of an ordinance by looking to whether there is a reasonable relationship between the ordinance and a legitimate government objective.

¶ 28 The reasonableness of the relationship between the ordinance and the government objectives to be achieved is the touchstone of the analysis in evaluating police power claims. Our case law reveals that the burden of compliance is. not dispositive. "That in operation a police measure may increase their labor, decrease the value of their property, or. otherwise inconvenience individuals, does not make the act to offend." *In re Interrogatories of the Governor*, 97 Colo. at 596, 52 P.2d at 667 (internal citation omitted). Moreover, " '[w]hen the subject lies within the police power of the state, debatable questions as to its reasonableness are not for the courts but for the legislature, which is entitled to form its own judgment, and its action within its range of discretion cannot be set aside because compliance is

---

**3.** Under the Colorado Constitution, home rule municipalities have "all ... powers necessary, requisite or proper for the government and administration of its local and municipal matters." Colo. Const. art. XX, § 6.

**4.** Section 31–1–101(6), C.R.S. (2013), defines "municipalities" for the purpose of Title 31 to include both statutory cities and towns and home rule cities and towns.

**5.** *See, e.g., Abdoo v. City & County of Denver*, 156 Colo. 127, 129, 397 P.2d 222, 222 (1964) (stating that the question is whether an ordinance "bears a fair relation" to the public health, safety, or welfare, and has a "definite tendency to promote

or protect" these fundamental interests); *City & County of Denver v. Thrailkill*, 125 Colo. 488, 501, 244 P.2d 1074, 1080 (1952) (stating that we must ̠determine whether the ordinance has a "real and substantial relation" to the accomplishment of police power objectives);· *id.* (stating that, to be valid, an ordinance must "bear a fair relation" to the public health, safety, or welfare and "tend to promote or protect" the same (quoting *Sapero v. State Bd. of Med. Exam'rs*, 90 Colo. 568, 580, 11 P.2d 555, 559 (1932) (Butler, J. concurring))).

**6.** The YCC does not allege that the ordinances at issue here restrict a fundamental right.

burdensome.'" *Id.* (quoting *Sproles v. Binford,* 286 U.S. 374, 388–89, 52 S.Ct. 581, 76 L.Ed. 1167 (1932)); *see also Cottrell Clothing Co. v. Teets,* 139 Colo. 558, 563, 342 P.2d 1016, 1019 (1959) (same).

¶ 29 Although in *Apple v. City & County of Denver,* 154 Colo. 166, 172–73, 390 P.2d 91, 95 (1964), we suggested that an ordinance must, in its application to a specific property, "be such as not to be an unreasonable demand upon the individual for the benefit of the public welfare," our ultimate holding in that case hinged not on the burden of compliance faced by the plaintiff, but on our conclusion that the provisions of the ordinance had a "definite relation" to the health and safety of the public, and that the repairs the plaintiff was required to make to her property were "not unreasonable in the light of the objective sought to be obtained." Similarly, in *U.S. West Communications,* we held that an ordinance compelling a public utility to relocate its facilities from the public right-of-way at the utility's own expense was a reasonable exercise of police power because the relocation would improve the city's aesthetics, enhance traffic safety, and better protect electric facilities, and thus the ordinance fairly related to the protection of the health, safety, and welfare of the public. 948 P.2d at 521. Although we observed that the ordinance allowed the utility to locate its facilities in a common trench excavated by the city, allowed for some variances, and allowed a utility to reroute facilities above ground, we noted that these factors were not required for a municipality to rationally require a utility to relocate its facilities at its own expense. *Id.* at 521–22.

¶ 30 Even in cases where we have struck down legislation as an abuse of police power, we have done so not because the provisions were burdensome or oppressive, but because we concluded that there was no rational relationship between the provisions of the legislation and the government objectives sought to be achieved. For example, in *City & County of Denver v. Thrailkill,* 125 Colo. 488, 500–01, 244 P.2d 1074, 1080 (1952), we observed that if a challenged ordinance abolishing the city's owner-driver taxicab system could be upheld as a valid police regulation, it could not be declared unconstitutional even though it put the plaintiff cab drivers out of business. We concluded, however, that the ordinance in that case failed entirely to show any fair relation to the public health, safety, morals, or welfare. Because the ordinance had "no reasonable relation" to these objectives and could not be said to "tend to promote or protect the same," we upheld the trial court's ruling declaring the ordinance unconstitutional. *Id.* at 501–02, 244 P.2d at 1080–81; *see also People v. Taylor,* 189 Colo. 202, 205, 540 P.2d 320, 322 (1975) (concluding that "no rational relation to legitimate state purposes" justified prohibiting cosmetologists from cutting men's hair when they were permitted to cut women's hair); *City of Englewood v. Apostolic Christian Church,* 146 Colo. 374, 380, 362 P.2d 172, 175 (1961) (holding that zoning ordinance that created blanket exclusion of churches from single and double family residence districts was "not in furtherance" of the health, safety, morals or general welfare of the community).

¶ 31 Importantly, in evaluating whether there is a reasonable relationship between the ordinance and a legitimate government objective, we do not inquire into whether less burdensome alternatives exist. Indeed, we have stated that "the question is not whether other solutions to a governmental problem are feasible or superior to the program actually adopted; the question is whether the decision made is itself reasonably and rationally related to the problem being addressed." *Sellon,* 745 P.2d at 233 (concluding that provisions of a city ordinance were rationally and reasonably related to problems of erosion, drainage, maintenance, and emergency access that affect the health and safety of the city's residents). We have made clear that we are not concerned with the wisdom of the particular method chosen by the governing body to address a perceived danger so long as the method chosen reasonably relates to the end to be achieved. For example, in *Love v. Bell,* 171 Colo. 27, 36–37, 465 P.2d 118, 123 (1970), we rejected the plaintiffs' "suggestion of alternative methods" as irrelevant to whether the statute challenged in that case was an unconstitutional exercise of police power. Similarly, in *United States Disposal Systems,*

we upheld an ordinance authorizing the city to provide free trash and garbage removal services as "enacted out of a valid concern for, and a reasonable relationship to, the public health, safety, and general welfare." 193 Colo. at 281, 567 P.2d at 367. In that case, we did not consider the losses that the fee-charging trash collection services might face as a result of the ordinance, *id.* and we declined to consider the "less drastic alternative of mere police power regulation of the private trash carriers," *id.* at 285, 567 P.2d at 370 (Erickson, J., dissenting).

¶ 32 In sum, our case law demonstrates that when evaluating the reasonableness of a municipality's exercise of its police power, the pivotal inquiry is the reasonableness of the relationship between the ordinance and government interest or objective sought to be achieved. In examining the reasonableness of this relationship, we do not compare or otherwise examine alternative methods for addressing the government objective. Where a municipal ordinance bears a reasonable relationship to a legitimate government interest, including the protection of the health, safety, and welfare of the public, the ordinance comports with due process and is a valid exercise of a municipality's police power.

### B.

¶ 33 In this case, whether the Town's ordinances constitute an abuse of police power turns on whether the Plaintiffs sustained their burden to show beyond a reasonable doubt that there was no reasonable relationship between the ordinances and a legitimate government purpose.

¶ 34 Ordinance 04–09, which authorized the road improvement project, states that the Town undertook the project in order to: (1) address "current road conditions . . . resulting in unsafe driving conditions which threaten lives and property"; (2) "improve . . . drainage"; and (3) "remedy a now-missing portion of the recreation path," which, as configured at that time, "forces current users of the recreation path . . . into a street where they mix with traffic rather than allowing them to remain on the recreation path where they avoid traffic." The Town passed Ordi-

nance 10–09 in connection with the road improvement project to "ratify and affirm the previously granted and current authority of the Town of Dillon Chief of Police to determine and designate those streets and rights of way within the Town where parking shall be prohibited." After Ordinance 10–09 was enacted, the police chief designated the recreation path across from the YCC as a no-parking zone, and painted "No Tandem Parking" on the Town's right-of-way in front of the YCC.

¶ 35 At trial, it was undisputed that the road improvement project satisfied the Town's need to connect a missing portion of a recreation path that pedestrians and bicyclists used to travel to the town center. The construction of the recreation path separated pedestrians and bicyclists from cars, eliminating the need to share the same road lane. It was also undisputed that the project placed drainage pans along both Gold Run Circle and Tenderfoot Street to collect and move storm water and snow runoff into Lake Dillon. Thus, the only disputed issue relevant here is whether the road improvement project was reasonably related to the Town's asserted interest in alleviating "road conditions . . . resulting in unsafe driving conditions which threaten lives and property."

¶ 36 The Plaintiffs challenged the Town's road safety concern by pointing to evidence that there was only one reported accident as a result of tandem parking at the YCC. The trial court found that the safety problem associated with tandem parking was not "particularly acute." However, to the extent that the trial court's finding suggested that tandem parking was not a legitimate safety concern for the Town, this finding was clearly erroneous. The absence of accidents does not prove that the Town lacked a legitimate safety concern with the tandem-parking arrangement. The testimony of the Town Engineer, the Town's Chief of Police, the Town's Public Works Director, a Town resident, and a transportation engineer, retained as an expert by the Town, all established that the tandem-parking configuration constituted a public safety concern. In any event, a municipality certainly need not wait for more accidents to happen before addressing a per-

ceived danger. *See* 6A Eugene McQuillen, *The Law of Municipal Corporations* § 24.10 (3d ed. 2007) (police power includes "power to anticipate and prevent dangers").

¶ 37 The trial court found that the road improvement project seeks to "aid drainage," "complete a missing link in a recreation path," and "reduce the possibility of accidents between [users of the recreation path] and automobiles." In short, Plaintiffs failed to show beyond a reasonable doubt that the ordinances are not reasonably related to legitimate government purposes of improving road safety, improving water drainage, and remedying a missing portion of a recreation path.

### C.

¶ 38 The trial court and the court of appeals ruled that the Town's ordinances were an unreasonable exercise of police power because alternatives existed that were less burdensome on the Plaintiffs. In so doing, the trial court and the court of appeals relied on a passage from *Goldblatt*, which states that, in evaluating whether an exercise of police power is reasonable, "we need to know such things as the nature of the menace against which it will protect, the availability and effectiveness of less drastic protective steps, and the loss which appellants will suffer from the imposition of the ordinance." 369 U.S. at 595, 82 S.Ct. 987. The lower courts' reliance on this statement was misplaced.

¶ 39 In the more than half a century since *Goldblatt* was decided, no subsequent United States Supreme Court decision or published opinion in Colorado has ever relied on this particular passage in *Goldblatt* as the proper "test" to examine the reasonableness of a municipal ordinance.[7] We conclude that this passage does not reflect the Supreme Court's

current police power jurisprudence, and we decline to apply it here.

¶ 40 At the time *Goldblatt* was decided, the Supreme Court's police power and regulatory takings jurisprudence was intertwined. In *Goldblatt*, the Supreme Court addressed a challenge to an amendment to a municipal ordinance that prohibited excavation below the water table within town limits. *Id.* at 592, 82 S.Ct. 987. For many years, Builders Sand and Gravel Corporation had conducted mining operations on property owned by Goldblatt. After enacting the amendment to the ordinance, the town brought suit against Goldblatt and the corporation to enjoin further mining. *Id.* at 591–92, 82 S.Ct. 987. Goldblatt and the corporation claimed that the town's ordinance was an abuse of police power because "it in effect prevents [the landowners] from continuing their business and therefore takes their property without due process of law in violation of the Fourteenth Amendment." *Id.* at 591, 82 S.Ct. 987.

¶ 41 In addressing Goldblatt's regulatory takings claim, the Supreme Court stated, "[i]f this ordinance is otherwise a valid exercise of the town's police powers, the fact that it deprives the property of its most beneficial use does not render it unconstitutional." *Id.* Although the Supreme Court recognized that "government action in the form of regulation cannot be so onerous as to constitute a taking," *id.* at 594, 82 S.Ct. 987 (citing *Pa. Coal v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)), it viewed the takings issue as within the question of whether the ordinance was a valid exercise of police power. In other words, if the ordinance was a reasonable exercise of police power, it was not a taking. Read in this context, the statement in *Goldblatt* relied upon by the trial court and the court of appeals conflates two differ-

---

7. Although we cited to *Goldblatt* in *Bethlehem Evangelical Lutheran Church v. City of Lakewood,* 626 P.2d 668, 673–74 (Colo.1981), we did not cite to or rely in any way on the three factors identified in this passage. (citing *Goldblatt* for its quotation of *Lawton v. Steele,* 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385 (1894), and applying the criteria set forth in *Lawton*). Moreover, to the extent we discussed *Goldblatt* at all in *Bethlehem Evangelical Lutheran,* we did so in the context of examining whether the City of Lake-

wood's action amounted to an unconstitutional taking of property. *Id.* We readily concluded in that case that the City's action was not an abuse of police power. *Id.* at 672 (expressing "no difficulty" in holding that conditioning a building permit on the construction of public improvements at the cost of the property owner was not unreasonable or a misuse of police power). In any event, as discussed in this opinion, the Supreme Court's police power and regulatory takings jurisprudence has since evolved.

ent questions: (1) whether the ordinance advanced a legitimate government interest; and (2) whether the ordinance was so burdensome that it amounted to a taking (and thus, could not be sustained as a valid exercise of police power).

¶ 42 For decades after *Goldblatt* was decided, the Supreme Court continued to wrestle with the relationship between regulatory takings and due process. In *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), for example, the Supreme Court relied on due process precedents in formulating a test for whether the application of a general zoning law to a particular property effects a taking. (citing *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 72 L.Ed. 842 (1928) (holding that a zoning restriction violates due process "if it does not bear a substantial relation to the public health, safety, morals, or general welfare"); *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (holding that a municipal zoning ordinance would survive a due process challenge so long as it was not "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare")). In so doing, the Court's articulation of the regulatory takings test blended due process and takings inquiries: "The application of a general zoning law to a particular property effects a taking if the ordinance does not substantially advance legitimate government interests, or denies an owner economically viable use of his land." *Agins*, 447 U.S. at 260, 100 S.Ct. 2138. Indeed, that the Supreme Court had not yet disentangled regulatory takings from due process analysis is most evident in *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 185, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), in which the Court acknowledged that it remained an open question whether a government regulation that is so restrictive that it denies a property owner all reasonable beneficial use of its property should be viewed as a violation of the Fourteenth Amendment's Due Process Clause, or as an actual "taking" under the Fifth Amendment requiring just compensation.

¶ 43 More recently, however, the Supreme Court has acknowledged in *Lingle v. Chevron*, 544 U.S. 528, 541, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), that its decision in *Agins* had blended due process and takings inquiries in examining whether the zoning ordinance in that case amounted to a regulatory taking. Notably, in its discussion on this point, the Supreme Court cited to *Goldblatt* as among the earlier sources of this "apparent commingling." *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 127, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Goldblatt*, 369 U.S. at 594–95, 82 S.Ct. 987).

¶ 44 The Court clarified that the "substantially advances" inquiry "suggests a means-ends test" that asks, in essence, "whether the regulation is *effective* in achieving some legitimate public purpose." *Id.* at 541, 125 S.Ct. 2074 (emphasis in original). Such an inquiry makes logical sense "in the context of a due process challenge, for a regulation that fails to serve any legitimate government objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Id.* By contrast, a takings claim focuses on the *"magnitude of the burden* a particular regulation imposes on private property rights." *Id.* (emphasis in original). Importantly, *Lingle* clarified that the burden on private property is the central concern of a *takings* inquiry. Whether a government regulation runs afoul of *due process* turns on whether the regulation serves a legitimate government objective. *See id.*

¶ 45 Thus, read in the context of current Supreme Court jurisprudence, *Goldblatt's* purported "test" for addressing an abuse of police power claim is unhelpful in resolving this case. The Supreme Court's contemporary regulatory takings jurisprudence makes clear that the relevant inquiries for due process and takings claims are distinct. Moreover, because the YCC did not (and could not) assert a takings claim, the lower courts' focus on the magnitude and character of the burden imposed on the YCC by the ordinances was misplaced.

## IV.

¶ 46 We hold that the Town did not abuse its police power in enacting the two ordi-

nances at issue here. An ordinance comports with due process where it bears a reasonable relationship to a legitimate government interest. The ordinances here were within the Town's police power to regulate matters of public health, safety, and welfare, and were a reasonable exercise of that power because the measures are reasonably related to the Town's objectives of improving traffic safety, improving water drainage, and remedying a missing portion of a recreational bike path. Accordingly, we reverse the court of appeals and remand this case to the court of appeals to review the Town's challenges to the trial court's other bases for relief.