No. 21669.

CITY OF COLORADO SPRINGS, A MUNICIPAL CORPORATION *v.* HAROLD GRUESKIN AND DIVIDEND AUTOMOTIVE EQUIPMENT COMPANY
(422 P.2d 384)

Decided December 19, 1966. Rehearing denied January 23, 1967.

282

F. T. HENRY, for plaintiff in error.

DALE L. HOLST, DONALD E. LAMORA, for defendants in error.

DONALDSON, HOFFMAN & GOLDSTEIN, A professional Corporation, Amicus Curiae.

A. T. SMITH, GORDON H. MAYBERRY, WILLIAM S. LIVINGSTON, Amici Curiae.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

Two cases are here consolidated. The issues are the same in each case. The plaintiff in error will be referred to as the City and the defendants in error will be mentioned as defendants.

The City accused the defendants of violating Sections 16-92 and 16-98 of the Code of the City of Colorado Springs on January 18, 1964, by making delivery of a flammable liquid, to-wit: gasoline, from a tank transport truck having a capacity in excess of 2,200 gallons. The delivery was made at a retail service station located at 824 West Colorado avenue, Colorado Springs, Colorado. Section 16-98 of the code of the City provides as follows:

*"With Capacity in Excess of Two Thousand Gallons Prohibited From Delivering To Stations, Etc.* No tank truck, tank trailer or tank semi-trailer having a total capacity in excess of two thousand gallons, including tolerances of ten per cent, shall be used for making regular deliveries to filling stations or to tank trucks

or trailers within the City, except as provided in the following Section."

Defendants admit that delivery was made from a tank transport truck having a capacity of 8,800 gallons, compartmented in compliance with National Board of Fire Underwriters Bulletin 385, Section 2231, which Bulletin is expressly adopted by Section 16-82 of the code of the City.

The principal issue in this case is whether Sections 92 and 98 of Chapter 16 of the code of the City of 1958 constitute a valid exercise of the police powers of the City. Dividend Automotive Equipment Company takes the position that the aforementioned sections do not have a substantial and real relation to the promotion of the public health, welfare and safety, but in fact are detrimental to the public health, welfare and safety.

Defendants further contend that the subject ordinances violate Article I of the Fourteenth Amendment to the Constitution of the United States and Section 25 of Article II of the Constitution of the State of Colorado in that they deprive the defendants of their property without due process of law; that they deny them equal protection of the laws; and that the ordinances are discriminatory and create classifications which have no real basis in fact. Defendants further contend that the ordinances violate Paragraph 3 of Section 8, Article I of the Constitution of the United States of America, commonly called the Commerce Clause, in that they impose an unreasonable restraint and burden upon commerce between the states. The pertinent evidence is as follows:

Dividend Automotive Equipment Company and Dividend Bonded Gas Company, corporations primarily owned by Harold R. Grueskin, operate four retail gasoline service stations in Colorado Springs, Colorado. One of these stations is outside the city limits by the distance of half the width of the street marking the boundary.

Operated in connection with it is a bulk plant and storage facilities where gasoline is kept for redelivery to the other locations in the City by means of a tank truck having a capacity of one thousand five hundred gallons.

Approximately four to five million gallons of gasoline are retailed at the four locations during the average year. Each of the locations has underground storage facilities and tanks for the storage of 24,000 gallons or more of gasoline. Each location is physically arranged and laid out in a manner which would make it relatively easy to unload a tank semi-trailer or tank trailer having a capacity of eight or nine thousand gallons in a short period of time in areas upon the premises which are apart from the area in which retail sales are made. With the exception of the North Union Boulevard location, all of the locations are relatively close to Interstate No. 25 which is the north-south freeway running through the City.

At the present time Dividend Automotive Equipment Company owns and operates a 1,500 gallon tank truck for the purpose of delivery of gasoline from the storage facilities located at 333 North Union Boulevard to the other three retail outlets located in Colorado Springs. The gasoline is normally unloaded at the North Union Boulevard facility from large tank trailers or semi-trailers for redistribution by means of the tank truck described. The redelivery of gasoline by use of the 1,500 gallon tank truck costs Dividend Automotive Equipment Company approximately one-quarter cent per gallon for delivery, or about $8,145 per year. This is a minimum figure and is calculated without taking into account special labor requirements which might be necessary to operate delivery facilities on a full time basis. A time study discloses that this method of operation substantially increases the exposure of the public to situations which could result in accident as a result

of human error. Such exposure is summarized by the following table:

EXPOSURE TO THE PUBLIC — WEEKLY

| EXPOSURE ON CITY STREETS | Using Present Tank Wagon System | Using 9,000 Gallon Transport |
|---|---|---|
| Miles Travelled | 376 | 31 |
| Hours | 25½ | 3 |
| Number of Trips | 58 | 11 |
| EXPOSURE IN STATIONS | | |
| Hours to Unload | 15 | 4¾ |
| Number of Connections (on and off) | 116 | 22 |
| Rate of Unloading (all with fastest devices) | 100 gal. per min. | 350-400 gal. per. min. |
| Hours to Load | 9 | 0 |
| Number of Connections (on and off) | 56 | 0 |

The "Tank Vehicles for Flammable Liquids" standard of the National Board of Fire Underwriters, which standard is set forth in National Board of Fire Underwriters Pamphlet 385, was introduced in evidence. In addition, Section 16-99 of the Code of the City permits the making of deliveries by transports with capacities up to 10,000 gallons at certain areas within the City. It is admitted that no truck routes for carriers of flammable liquids have been established by the City.

Testimony by Messrs. George F. Prussing, John Ainlay, Joseph Antonio and Harry W. Martin conclusively established that the danger is in the handling of gasoline and that the danger to the public increases almost in direct proportion to the number of times gasoline is handled or the frequency with which trucks carry gasoline over the city streets. All witnesses who testified, including Fire Chief Lausch and Battalion Chief Nice, agreed that there is no greater hazard in unloading a tank semi-trailer carrying 8,800 gallons of gasoline

at a retail service station once the tanker is located upon the premises, than there is in unloading from a tank wagon having a capacity of 2,200 gallons or less.

Expert witnesses testified on behalf of the defendants that under the ordinance in question the handling of gasoline was increased; the exposure time to the public was increased; the use of above ground bulk tank storage is more dangerous than underground storage; the safety devices available upon, and in fact in use on, the tank semi-trailers are much superior to those in use upon tank wagons. The tank wagon presented as an exhibit by the City contained none of the safety devices required by the ordinances of the City or by the National Board of Fire Underwriters Flammable Liquid Pamphlet No. 385. There was also testimony, which we deem logically true, that the existence of the present ordinance does not reduce the number of tank semi-trailers on the streets of the City because the City has a need and requirement for a minimum amount of gasoline to be used as fuel and energy each year, and that gasoline must be brought into the City either by tank truck, semi-trailers or railroad tank cars for delivery to the bulk plant which in turn redelivers it to retail service stations.

The defendants purchase gasoline which is refined in the State of Texas and then transport it into the State of Colorado by means of an interstate pipeline which is a common carrier. It is then delivered to a pipeline terminal in Denver at which time it is loaded into interstate truck carriers and delivered to the defendants in Colorado Springs, Colorado. The defendants then sell it to consumers, many of whom are involved in interstate travel.

Fire Chief Lausch's testimony indicates that the regulation of the capacity of trucks handling flammable liquids involves the possibility of spillage and its resultant problems of cleaning up the streets and washing the spillage into the sewer, which problems are par-

ticularly difficult in freezing weather; and that the ordinance resulted from a desire to limit the total quantity of gasoline which might be spilled in any one incident.

■ Section 16-94 of the Code of the City requires all unloading of gasoline to be conducted in accordance with the then existing regulations of the Interstate Commerce Commission. This Commission has not promulgated any rules or regulations limiting the size of compartmented tanks when making deliveries at retail stations; it has, however, adopted regulations which provide that uncompartmented trucks of a capacity of up to 10,000 gallons must be completely unloaded at one stop. Section 16-98 of the Code of the City authorizes uncompartmented vehicles with a capacity of up to 10,000 gallons to traverse the city streets without limitation for the purpose of making deliveries at bulk plants or other approved installations, except where sales are made at retail. Regulations have been promulgated by the Interstate Commerce Commission, the National Board of Fire Underwriters, and the National Fire Prevention Association to control and regulate the capacity, safety equipment and methods of loading and unloading of tank vehicles delivering gasoline. The regulations of the Interstate Commerce Commission have been adopted by the Public Utilities Commission of the State of Colorado and have further been adopted in part by the City of Colorado Springs. The City has inherent power to establish reasonable regulations which tend to promote the public health, welfare and safety.

It was clearly demonstrated by the evidence that the danger of unloading gasoline from a vehicle having a capacity in excess of 2,200 gallons (for example, the 8,800 gallon vehicle used by defendants in this case), is not greater than the danger encountered in unloading gasoline from a vehicle having a capacity of less than 2,200 gallons.

■ Local ordinances should have some reasonable

resemblance to recognized national standards established by qualified organizations or otherwise the regulated industry would be at the mercy of every whim and caprice of the many different communities. The cases cited by counsel in the briefs filed with the court indicate a wide variation of standards adopted by various cities in an effort to determine the safe capacity of a vehicle which may make a delivery of gasoline at a retail service station. It is not for the court to substitute its notions as to what is fair and reasonable, but to ascertain under all existing circumstances whether the standard established by the plaintiff, the City of Colorado Springs, is in fact reasonable and bears a reasonable relation to the public health, welfare and safety of the City and its inhabitants. While it might be desirable to classify service stations as to the capacity of the truck which may make delivery there, or to promulgate some other reasonable regulations applying to retail service stations based on their specific location in certain fire zones, we hold that the subject ordinance which requires the tank vehicles to pass through the city to a bulk plant, unload at the bulk plant, and then reload vehicles of a capacity of less than 2,200 gallons for redelivery to retail filling stations throughout the city, necessarily involves a greater exposure to hazard and accident, and therefore a greater danger to the public health, welfare, and safety of the city and its populace.

We are not impressed with the argument that the regulation does in fact tend to promote the public health, welfare and safety. When the particular ordinance is examined under the evidence here, we hold that it does not in fact promote the health, welfare and safety but on the contrary is detrimental thereto.

[6] The purpose of this ordinance as testified to by Fire Chief Lausch is to prevent a large spillage of gasoline upon city streets; yet its effect is to require an 8,800 gallon compartmented tank vehicle to pass by

defendants' Nevada Avenue station for which its cargo was eventually destined and traverse 2.4 miles of city streets, 25 intersections, discharge its cargo at a bulk station at which it is later to be reloaded into four smaller loads; and, with these four smaller loads retrace the 2.4 miles of city streets and cross the same 25 intersections. Chief Lausch's further testimony was that there was no greater danger from unloading a vehicle of a capacity of more than 2,200 gallons than in unloading a vehicle with a lesser capacity. When applied to defendants' Colorado Avenue station, at which the alleged violation occurred, we find that the station is located 5/10 of a mile from Interstate Highway 25 and involves the crossing of four intersections in making a direct delivery. However, if delivery is made under the existing ordinance, the large tank vehicle must travel 3.1 miles of city streets through thirty intersections to a bulk plant where it discharges its cargo, which is then reloaded into four smaller tank trucks, and proceeds to retrace the 3.1 miles of city streets and then pass through the same thirty intersections in order to discharge the cargo at this location. In addition, the number of connections which must be made at both the bulk plant and at the retail station are multiplied by four so that the opportunity for accident or mishandling is enhanced 400 per cent.

 The pertinent legal principles involved are thoroughly discussed in *Denver v. Denver Buick, Inc.*, 141 Colo. 121, 347 P.2d 919. We particularly call attention to the following apt statements of the law:

"* * * If a restriction upon the use of property is to be upheld as a valid exercise of the police power it must bear, 'a fair relation to the public health, safety, morals, or welfare,' and have 'a definite tendency to promote or protect the same.' In determining the validity of restraints upon freedom imposed by statute or ordinance, 'The determination we are called upon to make is whether the ordinance has a *real and substantial* rela-

tion to the accomplishment of those objectives which form the basis of police regulation.' *Denver v. Thrailkill,* supra. (Emphasis supplied). *Bohn v. Board of Adjustment of Denver,* 129 Colo. 539, 271 P.(2d) 1051.

\* \* \*

"(3) Any legislative action which takes away any of the essential attributes of property, or imposes unreasonable restrictions thereon, violates the due process clause of the Constitutions of the United States and the State of Colorado."

■ After extensive hearings the trial court found that the ordinance in question does not in fact tend to promote the public health, welfare and safety but accomplishes just the opposite result, namely, that it is in fact detrimental to the public health, welfare and safety, and that the City actually exceeded its authority in passing the ordinance. We concur in this conclusion.

The judgment accordingly is affirmed.

On petition for rehearing MR. JUSTICE McWILLIAMS formerly concurring now dissents and MR. JUSTICE KELLEY concurs in his dissent.

MR. JUSTICE McWILLIAMS, formerly concurring, now dissents.

Upon a reconsideration of this matter, subsequent to the filing of a petition for rehearing, I have changed my mind and at this time I would not only grant the petition for rehearing but now dissent from the majority opinion.

As already noted, the defendants in error upon trial in the county court in and for the county of El Paso admitted their violation of those municipal ordinances of the City of Colorado Springs with which we are here concerned. Their defense was that the ordinances in question are unconstitutional in that each is claimed to be an unreasonable and arbitrary exercise of the police power.

Upon trial the defendants in error offered evidence, and much of it, which indeed did support their thesis

that the ordinances in question did not promote public health, safety and welfare, and that in fact the ordinances were actually detrimental insofar as the public safety was concerned.

At this juncture in the proceedings before the trial court, the plaintiff in error then offered its evidence in support of its contention that the ordinances in question *did* in fact promote the public health, safety and welfare, and were therefore a reasonable exercise of its police powers. This evidence came in the main from the chief of the fire department for Colorado Springs. The gist of his testimony, as I understand it, runs somewhat as follows:

1. the *bigger* a gasoline transport tanker truck the *less* its maneuverability in traffic;

2. because of this *lessened* maneuverability, particularly as relates to the getting in and out of a retail filling station outlet, the *greater* the possibility of a *bigger* tanker truck, as contrasted with a *smaller* and *more maneuverable* truck, being involved in a vehicular collision with the resultant overturning of the *bigger* tanker truck;

3. with the more frequent overturning, then, of the *bigger* gasoline transport tanker truck the *greater* the risk of an explosion and fire; and

4. the overturning and rupturing of the *bigger* tanker truck would result in a *bigger* and *harder to handle* explosion and fire than would be the case if the gasoline had been transported in a *smaller* and *more maneuverable* gasoline transport tanker truck, even though the smaller truck might be involved in a collision.

It was on this general state of the record, then, with conflicting testimony as to the "reasonableness" of the ordinances in question, that the trial court in effect "overruled" the city council of the City of Colorado Springs and decreed that the ordinances under consideration were unconstitutional in that they constituted an unreasonable and arbitrary exercise of the police

power. In so doing, in my view the trial court committed error.

This is not a situation, as I see it at least, where we are searching the record to determine whether there is any evidence to support the finding of the trial court. Rather, our *only* task is to ascertain if there is *any* rational factual basis for the legislation under attack. It *is only* where the legislation lacks *any and all* reasonable basis that it may with propriety be labeled by the courts as arbitrary. And, furthermore, if the issue of "reasonableness" be one which is "fairly debatable," courts in such circumstance are not at liberty to substitute their judgment on the matter for that of the legislative body.

In my opinion there *was* evidence adduced upon the hearing of this matter which does demonstrate that the ordinances in question are grounded upon a rational factual basis and therefore neither ordinance in my view of the matter may with propriety be tagged as either unreasonable or arbitrary. In this regard, I refer, of course, to the testimony of the fire chief of Colorado Springs. In my view the fire chief's testimony does show the "reasonableness" of the ordinances here under attack. The fire chief in some detail outlined the reasons why these ordinances, in his opinion, would promote public safety by reducing the possibility of disastrous explosions and fires stemming from the overturning and rupturing of "big" gasoline tanker trucks.

At the very least, it would appear to me that this issue is a debatable one, one upon which reasonable minds might conceivably differ. And in such instance, as already noted, the court may not "second guess" the legislative body and substitute its judgment for that of the latter body.

*Standard Oil Company v. City of Marysville*, 279 U.S. 582, 49 S. Ct. 430, 73 L. Ed. 856 presents a factual situation deemed somewhat analogous to the present one. There, the city of Marysville, in Kansas, enacted an

294

ordinance which, with certain exceptions, required that all tanks used for the storage of petroleum products be buried at least three feet underground. Certain dealers in petroleum products promptly brought an action in the United States District Court for Kansas to enjoin the enforcement of this ordinance. The matter was then referred to a master.

Upon hearing before the master, voluminous evidence was taken, much of it described as "conflicting, speculative and theoretical" concerning the relative safety of storing petroleum products above, as opposed to below, the surface of the earth. The master thereafter made "elaborate findings" in which he came to the conclusion that it was safer to store gasoline above, rather than below, the ground. From this conclusion the master then went on to hold that the ordinance was unreasonable and arbitrary and therefore not a valid exercise of the police power. The United States District Court approved and adopted as its own the conclusion thus reached by its master.

The United States Circuit Court of Appeals for the Eighth Circuit reversed the judgment of the United States District Court for Kansas, *City of Marysville v. Standard Oil Co.*, 27 F.2d 478. In affirming this action of the Circuit Court, the United States Supreme Court, speaking through Mr. Justice Stone, after taking judicial notice that gasoline stored in large quantities is a "dangerously" inflammable substance, went on to declare as follows:

"We need not labor the point, long settled, that where legislative action is within the scope of the police power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of courts, but for that of the legislative body on which rests the duty and responsibility of decision."

\* \* \*

"*We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the*

*conclusion of the legislative body,* nor may we set aside the ordinance because compliance with it is burdensome." (Emphasis added.)

Similarly, in *Independent Dairymen's Association v. City and County of Denver,* 142 F.2d 940, an ordinance regulating the sale and distribution of milk in Denver was attacked on the ground that it was unreasonable and therefore arbitrary. In upholding that ordinance, the United States Circuit Court of Appeals for the Tenth Circuit, stated as follows:

"Our sole inquiry is whether a rational factual basis for the legislative requirement is so wanting as to make it unreasonable and purely arbitrary. We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the conclusion of the legislative body. We may only inquire whether it so lacks any reasonable basis as to be arbitrary. *Debatable questions as to reasonableness are not for the courts, but for the legislature, which is entitled to form its own judgment.* We may not set aside the ordinance because compliance with it is burdensome." (Emphasis added.)

In my appraisal of the situation, the ordinances under attack are a reasonable exercise of the police power. And in any event, the issue is at the very least a "debatable question." Certainly the net effect of the testimony of the Colorado Springs fire chief is that the ordinances *are* reasonable and *do* tend to promote public safety. This being the state of the record, the fact that there was other evidence to the contrary is under the circumstances of no legal significance. There being evidence, then, which in my opinion tends to show the reasonableness of the ordinances with which we are concerned, it is not within the province of the trial court, or this court, to substitute its judgment on the matter for that of the city council.

MR. JUSTICE KELLEY has authorized me to state that

he, too, would grant the petition for rehearing and that he now joins in the foregoing dissent.