CHIEF JUSTICE RICE delivered the Opinion of the Court.
*509 ¶ 1 This case presents the question of whether Aspen's $0.20 paper bag charge is a tax subject to voter approval under the Taxpayer's Bill of Rights ("TABOR").[1] The trial court held that this charge is not subject to TABOR because it is not a tax, but a fee, as did the court of appeals.
¶ 2 Colorado voters enacted TABOR in 1992. In so doing, voters specifically limited the legislative taxing power of the state and local governments by requiring that any new tax must receive voter approval prior to implementation. However, when a government exercises its authority pursuant to its police power to regulate for health and safety, and imposes a charge as part of a regulatory regime, and the charge is reasonably related to the direct or indirect cost of regulating the activity, such a charge is not a tax subject to voter approval.
¶ 3 The primary purpose of a tax is to raise revenue for general governmental expenses. But, the primary purpose behind Aspen's charge is not to raise revenue; the primary purpose of the charge is to defray some of the costs of a comprehensive regulatory scheme aimed at improving environmental health and safety through a waste-reduction program. Because the bag charge is not a tax, TABOR's election requirements do not apply. Accordingly, we affirm the judgment of the court of appeals.
I. Facts and Procedural History
¶ 4 In 2011, the City of Aspen adopted ordinance 13.24, which took effect May 1, 2012. Aspen, Colo., Municipal Code § 13.24 (2017). This ordinance purported to impose a regulatory scheme designed to meet the city council's "duty to protect the natural environment and the health of its citizens and visitors." Under the ordinance, grocery stores within Aspen's city limits are prohibited from providing disposable plastic bags to customers. § 13.24.020(a).[2] Grocery stores may still provide paper bags to customers, but each bag is subject to a $0.20 "waste reduction fee," § 13.24.030(a), unless the customer is a participant in a "Colorado Food Assistance Program," § 13.24.070.
¶ 5 It is undisputed at the trial court that Aspen set the fee at $0.20 after considering a San Francisco study showing that the cost of subsidizing the recycling, collection, and disposal of plastic and paper bags in that market was $0.17 per bag. Aspen adjusted the cost to $0.20 based on its distance to recycling markets, the smaller size of its waste stream, and community input.
¶ 6 Through a system established by the ordinance, the grocers collect the $0.20 charge for each non-reusable bag a customer chooses to use, and Aspen then collects the charge from the grocers. Grocers are permitted to retain a portion of the charge to provide information about the charge to customers, to train staff, and to improve or alter infrastructure to allow for the implementation, collection, and administration of the *510 charge. § 13.24.050(b). Grocers remit the remainder of the charge to Aspen on a form separate from their sales tax form. § 13.24.050(e). The grocers pay this remainder to the City of Aspen Finance Department, and the department deposits it into the "Waste Reduction and Recycling Account." § 13.24.050(d). The funds may not be used to supplant funds from the annual budget, and the funds never revert to the general fund. § 13.24.050(h)-(i). The payment covers the following, in order of priority:
(1) Campaigns conducted by the City of Aspen and begun within 365 days of the effective date of this act, to:
(A) Provide reusable carryout bags to residents and visitors; and
(B) Educate residents, businesses, and visitors about the impact of trash on the City's environmental health, the importance of reducing the number of disposable carryout bags entering the waste stream, and the impact of disposable carryout bags on the waterways and the environment.
(2) Ongoing campaigns conducted by the City of Aspen to:
(A) Provide reusable bags to both residents and visitors; and
(B) Create public educational campaigns to raise awareness about waste reduction and recycling;
(C) Funding programs and infrastructure that allows the Aspen community to reduce waste and recycle.
(D) Purchasing and installing equipment designed to minimize trash pollution, including, recycling containers, and waste receptacles;
(E) Funding community cleanup events and other activities that reduce trash;
(F) Maintaining a public website that educates residents on the progress of waste reduction efforts; and
(G) Paying for the administration of this program.
§ 13.24.050(g)(1)-(2).
¶ 7 In its first year the bag charge was not sufficient to cover the overall program expenditures, and so Aspen has since allocated general funds to cover the remaining expenses of the program. Aspen provided some of the services outlined in the ordinance prior to instituting this charge, and some of the services funded in part by the bag charge are provided to both city residents and visitors, regardless of whether the resident or visitor uses a paper bag and thus pays the charge.
¶ 8 Petitioner, the Colorado Union of Taxpayers Foundation ("CUT"), is a nonprofit whose goal is to "educate the public as to the dangers of excessive taxation, regulation, and government spending." After two of its members paid Aspen's bag charge, CUT sued the City of Aspen and several members of the Aspen city council in their official capacities. CUT asserts that Aspen's bag charge is a tax that was never subject to voter approval, and thus violates TABOR.
¶ 9 At the trial court, both Aspen and CUT moved for summary judgment. The trial court concluded that the charge is a fee, not a tax, and therefore not subject to TABOR; it thus granted Aspen's motion for summary judgment. The court of appeals, in a unanimous published opinion, affirmed. Colorado Union of Taxpayers Found. v. City of Aspen, 2015 COA 162, ¶ 27, 410 P.3d 625, 630. We granted certiorari, and we now affirm.
II. Standing
¶ 10 While the trial court found that CUT has standing, and Aspen does not dispute this finding, standing is still a threshold issue that we review de novo. Barber v. Ritter, 196 P.3d 238, 245 (Colo. 2008). We have briefly mentioned associational standing in our prior cases, but we now explicitly hold that an organization has associational standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members of the lawsuit. See Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co., 195 P.3d 674, 687-88 (Colo. 2008), as modified on denial of reh'g (Nov. 24, 2008); see also Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 344, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).
*511 ¶ 11 So, in order for CUT to bring a claim, CUT must first show that its individual members have standing to sue. We have established that a plaintiff-taxpayer will have taxpayer standing when the plaintiff "demonstrate [s] a clear nexus between his status as a taxpayer and the challenged government action." Hickenlooper v. Freedom from Religion Found., Inc., 2014 CO 77, ¶ 12, 338 P.3d 1002, 1008. Here, two of CUT's members are Aspen residents who paid the required bag charge; these two members have taxpayer standing. Therefore, because two of CUT's members have taxpayer standing and could have brought suit themselves, CUT satisfies part one of the test.
¶ 12 Additionally, CUT satisfies parts two and three of the test. The organization was formed to educate the public as to the dangers of excessive taxation, regulation, and government spending, so the interests it seeks to protect-preventing governmental districts from circumventing TABOR-are germane to its purpose. Thus, the association has "a stake in the resolution of the dispute." United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 555-56, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996). Finally, the relief CUT requests in this case is a court order that Aspen's bag charge is unconstitutional, which does not require the participation of its individual members. See Warth v. Seldin, 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, CUT has associational standing in this case.
III. Standard of Review
¶ 13 A trial court may enter summary judgment when there is "no genuine issue as to any material fact" such that a moving party is entitled to judgment as a matter of law. C.R.C.P. 56(c). We review a trial court's decision regarding summary judgment de novo. Huber v. Colo. Mining Ass'n, 264 P.3d 884, 889 (Colo. 2011). When reviewing constitutional issues, we presume that statutes are constitutional. Barber, 196 P.3d at 248. Further, we have previously held that to be unconstitutional, these statutes must be shown to be unconstitutional beyond a reasonable doubt. Id. The same presumptions and burdens of proof apply when a court construes a municipal ordinance. Town of Dillon v. Yacht Club Condo. Home Owners Ass'n, 2014 CO 37, ¶ 22, 325 P.3d 1032, 1038.
¶ 14 In this case, we granted certiorari to determine whether we should modify the standard of review that a court should apply when deciding if an ordinance is unconstitutional. However, we conclude that this ordinance is constitutional under either the "beyond a reasonable doubt" or the "preponderance of evidence" standard. Because we hold that Aspen's bag charge is constitutional, we do not decide-and express no opinion about-whether we should change the standard a court should use when it holds an ordinance is unconstitutional.
IV. Analysis
¶ 15 We begin with a brief background of TABOR and detail the differences between a government's legislative taxation power and its regulatory police power. We then analyze this charge and conclude it is not a tax.
A. TABOR Background
¶ 16 TABOR is a constitutional amendment, adopted by popular referendum in 1992, that "places a check by the electorate on the exercise of legislative taxing power." Huber, 264 P.3d at 886. The intent of the voters in enacting TABOR was to "impos[e] limitations on the spending and taxing powers of state and local government." Bickel v. City of Boulder, 885 P.2d 215, 225 (Colo. 1994) ; see also Havens v. Bd. of Cty. Comm'rs, 924 P.2d 517, 519 (Colo. 1996) ("[TABOR] places limits on the ability of state and local government to tax and spend.").
¶ 17 TABOR applies to "districts," which are defined as "the state or any local government." Colo. Const. art. X, § 20 (2)(b). Prior to implementing a new tax, districts must obtain voter approval for the new tax via an election. Id. art. X, § 20(4)(a). If a district is deemed to have illegally adopted a tax, a portion of the revenue collected pursuant to that policy must be refunded to taxpayers along with ten percent interest. Id. art. X, § 20(1). TABOR contains an internal *512 rule of construction, which states that courts should interpret TABOR to "reasonably restrain most the growth of government." Id. But, "this principle ... applies only where the text of [TABOR] supports multiple interpretations equally." Barber, 196 P.3d at 247-48. As a court, we must be mindful of constructions of TABOR that would "hinder basic governmental functions or cripple the government's ability to provide services." Id. at 248.
¶ 18 For TABOR to apply, a district must have levied a tax. However, while TABOR defines seven terms, Colo. Const. art. X, § 20 (2), notably absent is a definition of "tax." Therefore, we examine sources outside of TABOR to determine exactly when a district has levied a tax.
B. Legislative Taxation and Regulatory Police Power Background
¶ 19 The distinction between a municipality's power to tax and its regulatory police power "is thoroughly established, and with few exceptions, universally recognized." Post v. City of Grand Junction, 118 Colo. 434, 195 P.2d 958, 959-60 (1948). The distinction is explicitly recognized in Colorado's statutory provisions governing municipalities. Compare § 31-15-302(1)(c), C.R.S. (2017) ("The governing bodies in municipalities shall have the following general powers in relation to the finances of the municipality: ... To levy and collect taxes for general and special purposes on real and personal property."), and § 31-20-101, C.R.S. (2017) ("Power to levy taxes-on what property"), with § 31-15-401, C.R.S. (2017) ("General police powers"), and § 31-15-501, C.R.S. (2017) ("Powers to regulate business").
¶ 20 The Colorado Constitution permits the General Assembly to use taxes to "defray the estimated expenses of the state government." Colo. Const. art. X, § 2. Home rule cities have the power of taxation as well. Winslow Constr. Co. v. City & Cty. of Denver, 960 P.2d 685, 692 (Colo. 1998). We have previously defined taxes as charges that "raise revenues for general municipal purposes." Bloom v. City of Fort Collins, 784 P.2d 304, 308 (Colo. 1989). Indeed, a hallmark of taxes is "that they are intended to raise revenue to defray the general expenses of the taxing entity." Zelinger v. City & Cty. of Denver, 724 P.2d 1356, 1358 (Colo. 1986). Thus, when looking to see if a district has levied a tax, we look to see if the district is attempting to raise revenue for the general expenses of government.
¶ 21 A municipality has a related but distinct power to regulate under its police power. Under this power, a municipality may set forth regulations to promote the health, safety, and welfare of its citizens both via its "inherent power" as a city, City of Colo. Springs v. Grueskin, 161 Colo. 281, 422 P.2d 384, 387 (1966), and its statutory power, § 31-15-103, C.R.S. (2017) ("Municipalities shall have power to make and publish ordinances ... which are necessary and proper to provide for the safety, [and] preserve the health ... of such municipality and the inhabitants thereof...."). A municipality's police powers are broad, Yacht Club Condo., ¶ 25, 325 P.3d at 1038, and can be used to "support education and outreach on environmental sustainability," § 31-15-711(1)(j), C.R.S. (2017).
¶ 22 At times, a government will use its regulatory and tax powers in tandem with one another. For example, the General Assembly imposed regulations on the sale and use of marijuana through its existing regulatory powers. § 12-43.3-102, C.R.S. (2017). In a separate provision, the General Assembly levied a tax on marijuana. § 39-28.8-202, C.R.S. (2017). So, while the government may permissibly regulate and tax the same product, the government may levy a tax on a product only when using its legislative taxation power.
¶ 23 In the past, we have considered cases in which we have been asked to determine whether a charge was a tax or a regulatory charge. Our answer to that question in these cases turned implicitly on whether (1) the charge was imposed as part of a regulatory scheme enacted pursuant to the government's police powers and (2) the charge bore a reasonable relationship to the direct or indirect costs to the government of providing the service or regulating the activity. In cases in which the answer to these questions *513 was yes, we determined that the charges were not taxes. Where the primary purpose of the charge was to raise revenue for the general expenses of government, we concluded that the challenged assessments were taxes.
¶ 24 In Bloom, for example, we confronted a challenge to a charge assessed on owners of developed lots fronting city streets. 784 P.2d at 305. The charge was part of a regulatory enactment, and its purpose was stated as follows:
The Council hereby finds, determines and declares the necessity of providing maintenance and upkeep of the city's local streets and related facilities as a comprehensive Transportation Utility, with such maintenance to include, without limitation, the following activities: patching, crack sealing, seal coating, overlaying and other activities as are necessary in order that local streets and related facilities may be properly maintained and that the health, safety, and welfare of the city and its inhabitants may be safeguarded.
Id. To provide for that necessary maintenance, the city levied a charge on homeowners to defray some of the costs of its work. Id. at 305-07. The amount that each homeowner was charged was calculated by a formula designed to approximate the cost to the city of maintaining that homeowner's frontage. Id. We held that this charge was not a tax because the charge on property was "reasonably related" to the specific government expenditure of maintaining city streets abutting those properties. Id. at 305. Likewise, in Loup-Miller Constr. Co. v. City & Cty. of Denver, we held that a charge assessed on new customers in apartment buildings was not a tax because the charge was imposed on "new customers to defray the cost of increased treatment capacity attributable to the addition of new customers to the system." 676 P.2d 1170, 1175 (Colo. 1984). In Zelinger, we held that a charge assessed on property owners to pay for upgrades and modernization of Denver's storm drainage facilities was not a tax because the charge was assessed to defray the costs of the storm drainage improvements and the amount of the charge was set to capture the approximate direct and indirect costs of providing those improvements. 724 P.2d at 1358-59. And in Western Heights Land Corp. v. City of Fort Collins, we held that a charge assessed on those using water and sewer facilities was not a tax because its "principal object" was to defray the cost of specific government services, not to raise revenue, and the amount of the charge bore a reasonable relationship to the cost of providing the services. 146 Colo. 464, 362 P.2d 155, 158 (1961). In each of these cases, the charge was part of a comprehensive regulatory regime, the charge was intended to defray, in part, the costs of that regulatory work, and there was a reasonable relationship between the overall cost of the service and the charge.
¶ 25 By contrast, in Cherry Hills Farms, Inc. v. City of Cherry Hills Village, the city imposed a "Service Expansion Fee," designed to raise revenue to cover the general governmental expenses associated with "rapid growth and development." 670 P.2d 779, 783-84 (Colo. 1983). We easily concluded-indeed the city conceded-that the charge was a tax, noting that "[t]here is no mention of any regulatory function in the ordinance." Id. at 782.
¶ 26 So, to determine whether a government has enacted a tax, or levied another type of charge, we must determine if the government is exercising its legislative taxation power or its regulatory police power. To make this determination, we examine the government's primary purpose for enacting the charge. Barber, 196 P.3d at 248-49. If the primary purpose is to raise revenue for general governmental use, it is a tax. Bloom, 784 P.2d at 308 ; Zelinger, 724 P.2d at 1358. Conversely, if a charge is imposed as part of a comprehensive regulatory scheme, and if the primary purpose of the charge is to defray the reasonable direct and indirect costs of providing a service or regulating an activity under that scheme, then the charge is not raising revenue for the general expenses of government, and therefore, not a tax. Zelinger, 724 P.2d at 1359 ; Western Heights Land Corp., 362 P.2d at 158. Because voters were concerned only with limiting a government's legislative power to tax, *514 Bickel, 885 P.2d at 225-26, such regulatory charges are not subject to TABOR's election requirements.
¶ 27 One fairly straightforward way to determine whether a charge is imposed pursuant to a government's tax power or imposed incidentally to a regulatory scheme is to examine the government's stated purpose and the label that the government gives the charge. Of course, a "statutory charge may be labeled a fee, but in effect be a tax," Barber, 196 P.3d at 250 n.15, and we are normally called upon to decide only cases in which the government has attempted to circumvent TABOR's requirements by pretending that a tax is, in fact, not a tax, and labeled it accordingly. Thus, when we are asked to determine if a charge is a tax, we focus our core inquiry on the practical realities of the charge's operation to determine if the charge's primary purpose is in fact to raise revenue for general governmental use. In taking this practical view, we consider whether there is a reasonable relationship between the direct or indirect cost to the government of providing the product or activity assessed and the amount being charged.
C. Application
¶ 28 Aspen, as a home rule city, has the power of taxation set forth in the Colorado Constitution. Winslow, 960 P.2d at 692. As a district, it is constrained by TABOR's election requirements. Colo. Const. art. X, § 20 (4)(a). Thus, while Aspen undoubtedly has the power to levy a tax, it may not use its taxing power in violation of TABOR. Aspen also has the power to enact regulations for the health and welfare of its citizens. Grueskin, 422 P.2d at 387. Because we were asked to determine if this charge is a tax, we examine the charge to determine if it is an exercise of Aspen's power to tax or of the city's regulatory power.
¶ 29 Initially, to determine whether Aspen exercised its legislative taxing power, we consider Aspen's stated purpose for the charge and the label of the charge. In the preamble to the ordinance, the city council stated that it has a "duty to protect the natural environment and the health of its citizens and visitors." The city council determined that single-use shopping bags contribute to "greenhouse gas emissions, litter, harm to wildlife, atmospheric acidification, water consumption and solid waste generation." The city council further determined that "plastic bags have the greatest impact on litter and wildlife" and that "the best alternative to single-use plastic and paper bags is to shift to reusable bags for shopping." Based on these findings, the city council stated that it was in "the best interest of the health, safety and welfare of the citizens and visitors of Aspen to reduce the cost to the City of solid waste disposal, and to protect our environment and our natural resources by banning the use of disposable single-use plastic bags and to mandate a fee for the use of paper bags at grocery stores." Because the stated purpose of the ordinance is to protect the health, safety, and welfare of citizens and visitors of Aspen, and because Aspen labeled the charge a fee, we conclude that the ordinance does not facially purport to levy a tax.
¶ 30 While this is some evidence that Aspen did not enact a tax, we cannot stop our inquiry there. We must examine the practical realities of how the charge operates to determine if this charge is in fact imposed to defray the direct or indirect costs of regulation and if the amount of the fee is reasonable in light of those costs, or if the charge's primary purpose is to raise revenue for general governmental use. Here, the charge is assessed on consumers who choose to purchase non-reusable paper bags; those consumers must pay $0.20 to the grocery store for each non-reusable bag that they use. The grocery store remits a majority of the charge to the City of Aspen, which uses it to defray the cost of specific programs outlined in section 13.24.050(g). The scheme provides reusable carryout bags to residents and visitors, educates the public about the impact of disposable bags on the environment, raises awareness about waste reduction and recycling, and funds equipment designed to minimize trash pollution, including recycling containers and infrastructure to support Aspen's recycling program. § 13.24.050(g). This regulatory scheme is more than just a recycling program, and the benefits of the waste reduction *515 program are shared by citizens and visitors to Aspen who never pay the charge because they never use a paper bag. These facts do not make the charge a tax. We have held that a charge may incidentally benefit the general public without becoming a tax. Barber, 196 P.3d at 249-50. And the fact that the bag fee is part of a larger regulatory scheme that requires Aspen to spend money on more than just recycling bags would only present a problem if the amount charged for the bag bore no reasonable relationship to Aspen's cost of permitting the use of the bag. § 13.24.050(g).
¶ 31 It is to that question that we finally turn. We must determine whether the cost of the charge bears a reasonable relationship to the services that Aspen provides to charge payers. Barber, 196 P.3d at 250 n.15 (noting that a charge is a tax "if the statutory rate of the charge is unreasonably in excess of the cost of services the charge is designed to defray."). The charge at issue here is different from those we have considered in earlier cases in that Aspen is not providing the fee payer with a direct service such as storm drainage improvements, Zelinger, 724 P.2d at 1359, or road maintenance, Bloom, 784 P.2d at 305. Instead, Aspen is providing the indirect service of permitting the use of paper bags while recognizing that it will have to incur the cost of disposing of those bags. The government service for which the bag user is paying a fee is the waste disposal that will be necessitated by the use of that bag.
¶ 32 Aspen determined that the $0.20 charge was reasonable based on (1) a San Francisco waste-reduction study that found the cost of subsidizing recycling costs for plastic and paper bags was $0.17 per bag, (2) the city council's own analysis of its recycling costs, and (3) input from the community. The $0.20 charge is the amount that Aspen believes, based on the above factors, that it costs to recycle a paper bag. Nothing in the record suggests that Aspen used biased or unscientific information in setting the charge at $0.20 per bag, and we perceive no infirmity in Aspen's methodology to determine the price of the charge. Moreover, it was undisputed at the trial court that Aspen set the charge at $0.20 because it believed this was the amount it cost the city to recycle a bag. A fee charged as part of a regulatory regime such as this one does not need to exactly match the cost of providing the service or regulating the activity, but only needs to bear a reasonable relationship to that cost. Given that standard, it is plainly reasonable for Aspen to charge $0.20 per non-reusable bag to defray the costs of its waste-management scheme.
¶ 33 Accordingly, this charge is not a tax. The primary purpose of the charge is not to raise revenue. The primary purpose of the charge is to defray the reasonable direct and indirect costs of administering Aspen's specific, regulatory, waste-reduction scheme, and, particularly, to recoup the costs of recycling the bags that shoppers are still permitted to use under this regulatory scheme. Because the charge is not a tax, TABOR does not apply.[3]
V. Conclusion
¶ 34 Aspen's bag charge is not a tax of any kind. Instead of raising revenue with this ordinance, Aspen sought to regulate the use of plastic and paper bags as part of its waste management efforts. It did so by banning the use of plastic bags entirely and imposing a reasonable charge only on persons given a paper bag.
*516 ¶ 35 The amount of the charge imposed for the right to use a paper bag bears a reasonable relationship to Aspen's cost of permitting that use. Because of the limited nature of the question that we were presented, we decline to comment about the differences between fees, penalties, fines, or any of the myriad of other types of governmental charges. We were asked to determine if this charge is a tax. It is not. We therefore affirm the judgment of the court of appeals.
JUSTICE COATS dissents, and JUSTICE BOATRIGHT joins in the dissent.
JUSTICE HOOD dissents.

We granted certiorari to review the following issues:
1. Whether Aspen's levying of a $0.20 charge on every disposable paper bag provided by a grocer, which was imposed for the primary purpose of affecting customers' behavior and to fund services available to all Aspen residents, is a tax subject to TABOR.
2. What standard of review a court should apply when deciding whether the levying of a charge by a local government, without voter approval, violates TABOR.

Petitioner does not challenge this part of the ordinance.

Although we have determined that this is not a tax, CUT argues that because Aspen's bag charge was implemented for the purpose of influencing behavior, it is a sin tax. We disagree. While some taxes are conduct-regulating, it does not follow that every charge that regulates conduct is a tax. Municipalities frequently use penalties and fines-which are not taxes-to regulate conduct. For example, upon a criminal conviction, littering is punishable by a fine. § 18-4-511(3)(b)(4), C.R.S. (2017). Colorado implemented this fine in an attempt to influence behavior-the State is discouraging its citizens from littering. Under CUT's proposed analysis, this charge must be classified as a tax because the State levied the charge in an attempt to influence behavior. But fines are different from taxes, and littering fines are a valid exercise of a municipality's police power. People v. Hupp, 53 Colo. 80, 123 P. 651, 652-54 (1912). So, conduct regulation cannot be determinative of whether a charge is a tax, a fine, or a fee. Certainly, a central goal of Aspen's waste reduction plan is to reduce the number of non-reusable bags in circulation. But that goal does not convert Aspen's paper-bag fee into a tax.