The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 5, 2020

## 2020COA156

**No. 19CA0621, *TABOR Foundation v. Colorado Department of Health Care Policy and Financing* — Health and Welfare — Hospital Provider Fee Program — Colorado Healthcare Affordability and Sustainability Enterprise Act of 2017; Taxation — TABOR; Jurisdiction of Courts — Standing words**

A division of the court of appeals considers whether two foundations and two of their members have standing to contest the constitutionality of two Colorado statutes under the Taxpayer's Bill of Rights (TABOR), Colo. Const. art. X, § 20, and on other grounds. The division concludes that the two member plaintiffs do not have taxpayer standing or individual standing. The division also concludes that the foundations lack associational standing because they have not identified any members who have standing.

COLORADO COURT OF APPEALS **2020COA156**

Court of Appeals No. 19CA0621
City and County of Denver District Court No. 15CV32305
Honorable Ross B.H. Buchanan, Judge

TABOR Foundation, Colorado Union of Taxpayers Foundation, Rebecca R. Sopkin, and James S. Rankin,

Plaintiffs-Appellants and Cross-Appellees,

v.

Colorado Department of Health Care Policy and Financing; Colorado Healthcare Affordability and Sustainability Enterprise; Kim Bimestefer, in her official capacity as Executive Director of the Colorado Department of Health Care Policy and Financing; Colorado Department of the Treasury; Dave Young, in his official capacity as Colorado State Treasurer; and State of Colorado,

Defendants-Appellees and Cross-Appellants,

and

Colorado Hospital Association,

Intervenor-Appellee.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART, AND VACATED IN PART

Division V
Opinion by JUDGE BERGER
J. Jones and Pawar, JJ., concur

Announced November 5, 2020

William Banta, Englewood, Colorado; Lee A. Steven, R. James Valvo III, John J. Vecchione, Washington, D.C., for Plaintiffs-Appellants and Cross-Appellees

Philip J. Weiser, Attorney General, W. Eric Kuhn, Senior Assistant Attorney General, Jennifer L. Weaver, First Assistant Attorney General, Denver, Colorado, for Defendants-Appellees and Cross-Appellants

Polsinelli PC, Gerald A. Niederman, Sean R. Gallagher, and Bennett L. Cohen, Denver, Colorado, for Intervenor-Appellee

¶ 1    Plaintiffs, the TABOR Foundation, the Colorado Union of Taxpayers Foundation, Rebecca R. Sopkin, and James S. Rankin, claim that two Colorado statutes violate the Taxpayer's Bill of Rights (TABOR), Colo. Const. art. X, § 20, and are also otherwise unconstitutional.  The statutes require hospitals to make payments to the State of Colorado so that the state can obtain matching federal funding.

¶ 2    After rejecting the governmental defendants' standing challenge, the district court rejected all of the plaintiffs' attacks on the merits and dismissed the case.  We conclude that none of the plaintiffs have standing to bring their claims.  Therefore, while we affirm the district court's ultimate disposition — dismissal of the action — we reverse the district court's standing determination, and we vacate its order to the extent it adjudicated the claims on the merits.

## I.    Background

¶ 3    Colorado hospitals incur millions of dollars of losses every year when they provide medical care to persons who are uninsured and otherwise unable to pay for their care.  *See* § 25.5-4-402.4(2)(b),

C.R.S. 2019.  To address this economic burden, Colorado's General Assembly established two programs to obtain federal funds.[1]

¶ 4    The first was the Hospital Provider Fee (HPF) Program that was administered by defendant Colorado Department of Health Care Policy and Financing (the Department).  § 25.5-4-402.3, C.R.S. 2016.  The HPF Program was terminated in 2017 when the General Assembly enacted the Healthcare Affordability and Sustainability Fee (HASF) Program, administered by defendant Colorado Healthcare Affordability and Sustainability Enterprise (CHASE).  § 25.5-4-402.4, C.R.S. 2019.  Under both programs, hospitals are required to make payments to the state or a state-created enterprise.  The federal government provides matching funds to the state or the enterprise, and then the state or the enterprise distributes the combined funds to the hospitals.  § 25.5-4-402.4(2), C.R.S. 2019 (HASF Program declaration); § 25.5-4-402.3(1)(c)(I)-(V), C.R.S. 2016 (HPF Program declaration).

---

[1] The federal funds are made available through the Medicaid Program.  Title XIX of the Federal Social Security Act established the Medicaid Program, through which the federal government provides funding to states that implement medical assistance plans. 42 U.S.C. §§ 1396a-1396b.

¶ 5     Plaintiffs, two foundations and two of their members, contend that both programs violated TABOR because the money paid by the hospitals to the programs constitutes taxes that were not approved by the voters. They also contend that CHASE is an unlawful enterprise under TABOR, the HASF program violated TABOR's excess state revenues cap, and CHASE and the HASF program are unconstitutional because their enabling statutes violated the Colorado Constitution's single-subject requirement. The district court allowed the Colorado Hospital Association to intervene, and the Association advocated in support of defendants.[2]

¶ 6     In their cross-motions for summary judgment and in their statements to the district court, the parties agreed that the court should decide the case on the facts presented and that no trial was required. The court rejected defendants' argument that plaintiffs

---

[2] The other defendants are the Colorado Department of the Treasury; Dave Young, in his official capacity as Colorado State Treasurer; Kim Bimestefer, in her official capacity as Executive Director of the Colorado Department of Health Care Policy and Financing; and the State of Colorado.

lack standing, and the court addressed and rejected all of plaintiffs'

substantive attacks on the statutes and programs.[3]

---

[3] We note one procedural anomaly, though it does not affect our disposition. Usually, as was the case here, a claim of lack of standing or lack of subject matter jurisdiction is brought under C.R.C.P. 12(b)(1). The state defendants moved to dismiss under C.R.C.P. 12(b)(1) for lack of standing. Instead of deciding the C.R.C.P. 12(b)(1) motion, the court decided the question on the parties' cross-motions for summary judgment. But the disposition of a motion under C.R.C.P. 12(b)(1) is fundamentally different from the disposition of a summary judgment motion under C.R.C.P. 56. Under well-established standards governing summary judgment, all doubts must be resolved in favor of the non-moving party and all reasonable inferences (irrespective of whether the facts on which the inferences are based are themselves undisputed) must be drawn in favor of the non-moving party. *Cotter Corp. v. Am. Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 819 (Colo. 2004). None of these rules apply to a hearing to adjudicate questions of subject matter jurisdiction. *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 925 (Colo. 1993). In the subject matter jurisdiction context, the court sits as the trier of fact and makes the required findings of fact and conclusions of law as to its jurisdiction. *Id.* The court does not view the evidence in the light most favorable to the non-moving party. *See id.* As a result, there is a serious question whether summary judgment, with its attendant standards, is an appropriate vehicle to decide jurisdictional questions. *See id.* at 924. As we read the parties' submissions to the district court and the district court's order, the court essentially followed the procedure outline in *Trinity* (albeit on undisputed facts) to decide the standing question, notwithstanding the fact that the case was decided on cross-motions for summary judgment.

¶ 7    Relying in part on supreme court authority postdating the district court's order, we conclude that none of the plaintiffs have standing to bring these claims.

## II.    Standing

¶ 8    Because standing is a jurisdictional prerequisite to a case going forward, we must address it first.  *Hickenlooper v. Freedom from Religion Found., Inc.*, 2014 CO 77, ¶ 7.  "A court does not have jurisdiction over a case unless a plaintiff has standing to bring it."  *Hotaling v. Hickenlooper*, 275 P.3d 723, 725 (Colo. App. 2011).  We review de novo whether a plaintiff has standing.  *Id.*

¶ 9    To establish standing, a plaintiff must demonstrate "(1) that the plaintiff 'suffered injury in fact,' and (2) that the injury was to a 'legally protected interest.'"  *Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008) (quoting *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 538 (1977)).

¶ 10    Plaintiffs argue, as they did below, that the member plaintiffs have taxpayer standing and individual standing.  They also argue that the foundation plaintiffs have associational standing.  The district court agreed, finding that the member plaintiffs have "standing based on their challenge to the constitutionality of the

subject provisions under TABOR" and that the foundation plaintiffs have associational standing based on their members' standing.

¶ 11    We now consider whether plaintiffs have any of the three types of standing — taxpayer standing, individual standing, or associational standing.

## A.    Taxpayer Standing

¶ 12    Unlike the federal courts, Colorado courts have historically granted broad standing to taxpayers. *Compare Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134 (2011) ("Absent special circumstances . . . standing cannot be based on a plaintiff's mere status as a taxpayer."), *with Nicholl v. E-470 Pub. Highway Auth.*, 896 P.2d 859, 866 (Colo. 1995) ("[T]axpayers have standing to seek to enjoin an unlawful expenditure of public funds.").

¶ 13    In *Barber v. Ritter*, a case heavily relied on by plaintiffs, the Colorado Supreme Court held that taxpayers had standing "to seek to enjoin an unlawful expenditure of public funds." 196 P.3d at 246 (quoting *Nicholl*, 896 P.2d at 866). The court further held that "Colorado case law requires us to hold that when a plaintiff-taxpayer alleges that a government action violates a specific

6

constitutional provision . . . such an averment satisfies the two-step standing analysis." *Id.* at 247.

¶ 14    More recently, however, the supreme court has clarified that taxpayer standing requires a plaintiff to "demonstrate a clear nexus between his status as a taxpayer and the challenged government action" to satisfy the injury-in-fact requirement. *Hickenlooper*, ¶ 12; *accord Hotaling*, 275 P.3d at 727. In *Hickenlooper*, ¶ 15, the supreme court held that "incidental overhead costs" that were incurred by the Governor's Office to issue a day of prayer proclamation were "not sufficiently related to [the plaintiffs'] financial contributions as taxpayers to establish the requisite nexus for standing."

¶ 15    Still later, in an opinion announced after the district court issued its judgment in this case, the supreme court further explained that a plaintiff must "establish a clear nexus between her status as a taxpayer and the constitutional violation she alleges." *Reeves-Toney v. Sch. Dist. No. 1*, 2019 CO 40, ¶ 28. "[T]he interest of the *taxpayer* who challenges the constitutionality of government action is her 'economic interest in having h[er] tax dollars spent in a constitutional manner.'" *Id.* at ¶ 23 (second alteration in original)

7

(emphasis in original) (quoting *Conrad v. City & Cty. of Denver*, 656 P.2d 662, 668 (Colo. 1982)).

¶ 16    The district court found that the member plaintiffs have taxpayer standing "based upon their challenge to the constitutionality of the subject provisions under TABOR, pursuant to the test articulated in *Barber* and *Dodge*."[4]  The court further found that the nexus requirement was not "a qualification with which the court need be concerned" because "the amounts at issue here are many orders of magnitude greater than the incidental overhead expenses involved in *Hickenlooper*."

¶ 17    The amount of funds at issue, however, does not, by itself, "establish a clear nexus between [plaintiffs'] status as . . . taxpayer[s] and the constitutional violation [they] allege[]." *Reeves-Toney*, ¶ 28.  The unrebutted evidence is that *hospitals*, not taxpayers, make the required payments to the programs.  Then, after collecting the matching federal funds, the programs remit the money back to the hospitals.  There is no evidence in the record

---

[4] *Dodge v. Department of Social Services*, 198 Colo. 379, 600 P.2d 70 (1979), is a taxpayer standing case that predates *Barber v. Ritter*, 196 P.3d 238, 245 (Colo. 2008).

that individual taxpayer dollars are used by the programs in any way. Simply put, the unrebutted evidence is that the programs are funded solely by the hospitals and matching federal dollars. Thus, under the teachings of *Hickenlooper* and *Reeves-Toney*, there is no nexus between the member plaintiffs' taxpayer dollars and the hospital programs.

¶ 18 Undeterred, plaintiffs argue that the healthcare financing programs "are funded with state general appropriations." This assertion is made without a citation to the record, as required by C.A.R. 28(e), and it finds no support in the record. In fact, there is significant, unrebutted evidence in the record — including annual financial reports and uncontroverted deposition testimony by Department officials — demonstrating the opposite: no taxpayer funds were used by the programs, including no comingling of taxpayer dollars with the hospital payments. Thus, this case is different from *Barber*, where money from a special fund was combined with taxpayer dollars from the state's General Fund and used "to defray general governmental expense." 196 P.3d at 247.

¶ 19 The member plaintiffs' final argument regarding taxpayer standing is that standing is conferred by the citizen-suit provision

9

in TABOR, which provides, "[i]ndividual or class action enforcement suits may be filed and shall have the highest civil priority of resolution." Colo. Const. art. X, § 20(1). This language undoubtedly satisfies the legally-protected-interest element of standing because "[c]laims for relief under the constitution . . . satisfy the legally-protected-interest requirement." *Hickenlooper*, ¶ 10. But, as in *Hickenlooper*, there remains the question of whether the member plaintiffs have established the other element — "injury as Colorado taxpayers" — which requires a nexus. *Id.* at ¶¶ 11-12. As demonstrated, the answer to that question is "no."

¶ 20     It is inconsequential that neither *Hickenlooper* nor *Reeves-Toney* addressed a TABOR challenge because their teachings are not limited to non-TABOR cases. Those cases prescribe the law of taxpayer standing in Colorado, and their reasoning is fully applicable here. We see nothing in those cases indicating that TABOR challenges receive different treatment, or that the type of constitutional claim matters in any respect to the question of taxpayer standing. To the contrary, the supreme court's reasoning is comprehensive and definitive: "[T]o establish standing as a taxpayer, a plaintiff must establish an injury relevant to her status

10

as a taxpayer — that is, *to the use of her tax dollars.*" *Reeves-Toney*, ¶ 30 (emphasis in original). Thus, to the extent requested by plaintiffs, it is not for us to invent any TABOR exception to the supreme court's clearly articulated law of standing.

¶ 21 Because there is no nexus between the member plaintiffs' taxpayer dollars and the constitutional violations that they allege, the member plaintiffs do not have taxpayer standing. The district court erred by concluding otherwise.

## B. Individual Standing

¶ 22 We next consider whether the member plaintiffs have individual standing. The member plaintiffs argue that they have individual standing because they suffered an economic injury. Specifically, they allege that the HPF Program caused *their* bills for *their* hospital care to increase beyond what they would have been required to pay but for the programs. As we understand their argument, there are two subparts. First, the member plaintiffs' bills increased because they received treatment from hospitals that incurred a net loss under the HPF Program — that is, the hospitals received less back in payments under the program than they paid.

11

Second, they hypothesize that the hospitals recovered this net loss by increasing patients' bills, including the member plaintiffs' bills.[5]

¶ 23    Individual standing "flows from a direct and individualized injury to the plaintiff." *Hickenlooper*, ¶ 11 n.10.  The injury must be one of "concrete adverseness," and "'an injury that is overly "indirect and incidental" to the defendant's action' will not convey standing."  *Id.* at ¶ 9 (citations omitted).

¶ 24    In *Wimberly v. Ettenberg*, the Colorado Supreme Court considered whether bail bondsmen had individual standing to sue the Denver District Court for adopting a pretrial release program that allowed criminal defendants to choose from a number of bail alternatives.  194 Colo. at 165, 570 P.2d at 536-37.  The court reasoned, "[a]lthough the pre-trial release program may affect the business of the bail bondsmen as a practical matter, it does so only indirectly by permitting criminal defendants to choose amongst an

---

[5] Plaintiffs do not allege that any member received medical services from a hospital while the HASF Program was in effect or that the HASF Program caused any members financial harm.  Their alleged economic injury only pertains to the HPF Program.  Because we conclude that none of the members have individual standing to contest the constitutionality of either program, we need not separately address this pleading deficiency regarding the HASF Program.

increased number of bail alternatives." *Id.* at 168, 570 P.2d at 539. Thus, the court held that the "[i]ndirect and incidental pecuniary injury" to the bail bondsmen's business was "insufficient to confer standing." *Id.*

¶ 25 Here too, the programs affect healthcare consumers only indirectly — if at all — because hospitals have a number of alternatives for recouping any net loss under the programs. True, when faced with a net loss, hospitals *might* attempt to recoup the deficit by increasing patients' bills. Or, as the Attorney General suggests, hospital networks might subsidize individual hospitals when the hospital network as a whole incurs a net gain under the program. (The Attorney General cites record evidence demonstrating that the hospitals visited by the member plaintiffs were part of hospital networks that received more in payments under the HPF Program than its members paid into the program.) Or hospitals might deal with a net loss by cutting costs in other ways. But on this record, all of this is speculation.

¶ 26 In the absence of any evidence supporting their theory of economic injury, the member plaintiffs rely on the Colorado Hospital Association's brief in the district court as evidence that

hospitals are passing along the cost of the payments to patients. But the Association said that the program costs are not passed on to patients:

> The hospital provider fees are not passed through to patients as charges on bills or otherwise. While some of the costs entailed in operating the provider fee may be subsumed in hospital bills generally (like any element of overhead), there is no pass-through or linear relationship between the hospital provider fee and hospital charges.

In the end, as in *Wimberly*, the mere possibility that "some of the costs . . . may be subsumed in hospital bills generally" does not demonstrate the concrete adverseness between the member plaintiffs and the state-run programs that is required to establish an injury-in-fact.

¶ 27　For similar reasons, we also conclude that the economic injury alleged by plaintiffs is too speculative. The member plaintiffs presented no evidence that their hospital bills were higher than they would have been absent the hospitals' participation in the HPF Program.

¶ 28　Plaintiffs nevertheless argue that the charges are necessarily passed on to patients because (1) the HPF statute prohibited

identifying any part of the charge as a line item on a patient's bill; (2) the General Assembly did not expressly prohibit hospitals from passing on the charges to patients; (3) a later bill was introduced, but not passed, that would have removed the line-item prohibition, allegedly to increase transparency; and (4) "basic economics teaches that entities pass along charges, like taxes, to their customers."

¶ 29  Absent any supporting evidence, however, these theories are insufficient to show that the member plaintiffs suffered an actual economic injury.  Hypotheses about why language was or was not included in a statute are simply too speculative, standing alone, to establish the "concrete adverseness" that is required to demonstrate individual standing.  *Hickenlooper*, ¶ 9 (citation omitted).

¶ 30  "[A] plaintiff must establish" standing, *id.* at ¶ 8, and the member plaintiffs have not done so.

### C.  Associational Standing

¶ 31  Last, the foundation plaintiffs contend that they have associational standing.

> [A]n organization has associational standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the

15

claim asserted, nor the relief requested,
requires the participation of individual
members of the lawsuit.

*Colo. Union of Taxpayers Found. v. City of Aspen*, 2018 CO 36, ¶ 10.

¶ 32     The foundation plaintiffs' claim of associational standing fails

at step one.  As previously shown, their two proffered members do

not have standing, and the foundations have not identified any

other member who does.

### III.   Conclusion

¶ 33     The district court's ultimate disposition — dismissal of the

action — was correct and we affirm it.  But because none of the

plaintiffs have standing to bring this case, the district court should

have dismissed the case for lack of standing.  Because the district

court did not have jurisdiction to decide the merits of the dispute,

we vacate those portions of its order addressing the merits.  *See*

*Hickenlooper*, ¶ 8; *see also In re M.M.V.*, 2020 COA 94, ¶ 44

(vacating the judgment when the court lacked jurisdiction).

¶ 34     The judgment of dismissal is affirmed.  The district court's

rejection of the defendants' standing challenge is reversed, and

those portions of the district court's judgment that address the

merits of the plaintiffs' claims are vacated.

JUDGE J. JONES and JUDGE PAWAR concur.